JOURNAL ENTRY and OPINION
{¶ 1} Appellant Kimberlynn Timbers appeals from the trial court's order granting summary judgment in favor of appellees Sears, Roebuck 
Co., Robert Robinette, Terry Butram and George Ross (hereinafter referred to collectively as "Sears" where appropriate). Timbers sets forth the following assigned error for our review:
 {¶ 2} "I. The trial court erred to the prejudice of plaintiff-appellant in granting defendants' motion for summary judgment."
 {¶ 3} Having reviewed the record and pertinent law, we affirm the trial court's judgment. The apposite facts follow.
 {¶ 4} On November 20, 2002, Timbers filed suit against her former employer Sears, along with her former supervisors Robert Robinette and George Ross and co-employee Terry Butram, for sexual harassment, retaliation, and infliction of emotional distress. Sears, Ross, Robinette, and Butram filed a joint motion for summary judgment, which the trial court granted. Timbers appeals.
 {¶ 5} Sears hired Timbers as a part-time sales associate on April 16, 1993 at its Randall Park Mall store. Timbers was promoted on December 17, 1997 to General Manager of the Sharon, Pennsylvania store. She became General Manager at the Niles, Ohio store on August 1, 2000.
 {¶ 6} Sears terminated her on February 25, 2002 because she failed to pay overtime to her staff, which violated Federal law and Sears' policy. Her Assistant Manager, Ruth DeMarco, was also discharged for the same reason the previous month.
 {¶ 7} As a Sears General Manager, Timbers attended monthly managerial meetings. A cocktail hour usually ensued. During these meetings Timber was subjected to" locker room" behavior by male colleagues who made sexual jokes and comments. Timbers admitted the comments occurred more often at the ensuing cocktail hour than the meeting, and she was not required to attend. Although she approached several of the men on her own to inform them she was uncomfortable with the comments, she did not report the matter to her superiors. Timbers also admitted the comments were not directed at her, but were made about women in general,[1]
although we fail to see the difference.
 {¶ 8} According to Timbers, Robinette, her direct supervisor, referred to her as "Kimmie" and "sweetie," on multiple occasions. She found this demeaning. One time, he placed his arm around her to console her when her store flooded. Timbers thought this inappropriate and pulled away from him.
 {¶ 9} Timbers also stated at the time of the store flooding, Robinette called the store around 9:00 p.m. looking for her. Sears employee Norma Bartek answered the phone and told Robinette that Timbers had left. Bartek informed Timbers that Robinette responded, "stupid bitch." Bartek did not know who he was referring to, her or Timbers. Timbers reported the matter to the then Human Resources Manager, George Ross. Ross advised her to tell Bartek to call the Sears ethics line. The next day Robinette called Timbers to voice his displeasure that his comment was reported.
 {¶ 10} At the managerial meeting held on November 27, 2001, the Sears reorganization plan was discussed. The reorganization required a reduction of salaried managers at the store. At the meeting Robinette presented the idea to photograph employees for ease of discussion. Ross supported the idea. Timbers, however, vocally opposed the photographs. She believed it could create potential discrimination issues if a pattern was established regarding who was terminated. Timbers stated side comments were then made by several male employees regarding taking nude photographs of women. Also, in discussing who should be terminated, a comment referring to Arab-Americans as "rag heads" was made.
 {¶ 11} Timbers called the Director of Human Resources, Mike Reskey, after the meeting to discuss her objection to the photographs. Reskey agreed it was a bad idea. Timbers received an e-mail the next day indicating the matter was tabled until further discussion.
 {¶ 12} Timbers believes she was terminated because of her opposition to Robinette's idea of using photographs. According to Timbers, it was soon after her objection that she was investigated for not paying overtime. Timbers denied that she failed to pay employees for overtime, or that she paid for overtime with store vouchers.
 {¶ 13} Manager Cynthia Heggs attended the managerial meetings and did not recall any sexist comments or the comment "rag head" being used to refer to Arab-Americans. She did recall Timbers objected to the photographs. According to Heggs, after the objection was made, the managers were told to wait to take the pictures until Ross got back to them. Although Heggs herself went ahead and took the photographs, she said it was not because Sears directed her. She never used the photographs.
 {¶ 14} Jeffrey Curry, a Sears manager and good friend of Timbers, recalled that Timbers was quite vocal in her opposition to the photographs. In fact, he kicked her under the table in order to get her to stop. Curry stated the idea was tabled until further discussion. Curry admitted that he took the photographs, but did so to "stay ahead of the curve." He discarded the photographs after he was advised the photographs were not to be taken.
 {¶ 15} George Ross was the Human Resources Manager for Sears from February 16, 1999 until January 1, 2002. He is presently the Operations Manager of the Cleveland District, which includes the Sharon, Pennsylvania and Niles, Ohio stores. Ross admitted he considered the idea of photographing employees because the final selection of who would be terminated was to be made at a district-wide meeting, with all staff and general store managers participating. He stated, "because not all of the candidates being considered would be well known to all of the other managers and/or members of the district staff," he thought photographing the employees was a good idea to "jog our respective memories regarding our prior knowledge and/or experience with the candidate."[2]
 {¶ 16} Ross recalled Timbers objected to the idea as being unlawful. Therefore, he told the managers at the conclusion of the meeting not to take the photographs until further notice. The idea was dropped after Ross heard from the Fair Employment Office not to use photographs.
 {¶ 17} According to Ross, at the November 27th meeting, he was notified that an investigation of overtime practices was being conducted at the Niles, Ohio store. As a result of the investigation, Timbers was terminated. The decision to terminate Timbers was not made by Ross or Robinette. The decision was made by the outgoing Human Resources Director for the North Central Region at the time, Merle Grizelle, and his replacement Greg Whitson, along with the Director of Human Resources, Gail Forrest, and the Senior Vice President of the North Central Region, Teresa Bird. According to Ross, a 52-year-old white woman was hired to replace Timbers.
 {¶ 18} Joseph Duganiero is the Regional Asset Protection Manager for the Cleveland District. He testified that part of his responsibilities is to investigate allegations of misconduct against Sears managers in the district. Duganiero was advised on November 26, 2001 by Fred Thompson, the Asset Protection Manager of the Niles store, that a voucher for a Sears employee was approved. Norma Bartek, the payroll officer at the Niles store, told Thompson the voucher was given to a sales associate in lieu of overtime pay. Thompson discovered that several associates were receiving store vouchers instead of overtime pay. According to Duganiero, such practice violates Federal Labor Laws and Sears' policy. Duganiero informed Robinette and Ross of the allegations at the November 27th meeting and was instructed to continue to investigate the matter.
 {¶ 19} Several employees admitted they were given vouchers instead of overtime pay. Payroll officer Norma Bartek stated that both Operations Manager, Ruth DeMarco, and General Manager, Kim Timbers, ordered her to adjust hours and not to pay overtime. Instead, employees working overtime were to be given store vouchers or time-off as compensation.
 {¶ 20} Duganiero also investigated the Sharon store because Timbers was its prior manager. John Keaty was Timbers' successor at the store. Keaty informed Duganiero that when he first became manager of the store, he was made aware of the fact that associates were paid with vouchers in lieu of overtime. He immediately put a stop to the practice. The payroll officer at the Sharon store, Kathy Davis, told him that when Timbers was manager, she instructed her to adjust the hours of associates so that overtime hours were not reflected.
 {¶ 21} Statements of employees who worked overtime and were paid via vouchers or given time-off instead of overtime wages were also attached to Sears' motion for summary judgment. The statements of the payroll officers were also attached in which they attested to Timbers instructing them not to pay overtime wages.
 {¶ 22} After considering the above evidence, the trial court granted Sears' motion for summary judgment without opinion. Timbers now appeals.
 {¶ 23} Timbers argues the trial court erred in granting summary judgment because issues of fact remained regarding her claims of sexual discrimination, sexual harassment, and retaliatory conduct. She also claims there was evidence that Sears employees were threatened to not assist Timbers in her lawsuit.[3]
 {¶ 24} We consider an appeal from summary judgment under a de novo standard of review.[4] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[5] Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can only reach one conclusion which is adverse to the non-moving party.[6]
 {¶ 25} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[7] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will only be appropriate if the non-movant fails to establish the existence of a genuine issue of material fact.[8]
 {¶ 26} Initially, we note that at oral argument, Sears' counsel argued that Timbers was lying. However, in reviewing a granting of summary judgment, we must view the evidence in the nonmoving party's favor and determine if reasonable minds can only reach one conclusion. We do not weigh any of the evidence nor do we defer to the trial court.
 {¶ 27} Timbers first argues the trial court erred by granting summary judgment in favor of Sears on her sexual discrimination claim.
 {¶ 28} R.C. 4112.02(A) provides:
 {¶ 29} "It shall be an unlawful discriminatory practice:
 {¶ 30} "For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 31} R.C. Chapter 4112, is Ohio's counterpart to Section 2000e, Title 42, U.S. Code ("Title VII"). Therefore, federal case law interpreting Title VII is generally applicable to cases brought under Chapter 4112.[9] In McDonnell Douglas Corp. v. Green,[10] the United States Supreme Court established a flexible formula to ferret out impermissible discrimination in the hiring, firing, promoting, and demoting of employees.
 {¶ 32} A prima facie case of discrimination under the McDonnellDouglas framework requires a plaintiff to establish that he or she: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position either lost or not gained; and (4) that the position remained open or was filled by a person not of the protected class.[11]
 {¶ 33} A plaintiff can also make out a prima facie disparate treatment case by showing, in addition to the first three elements, that the employee was "treated differently than a similarly situated employee from outside the protected class."[12] To be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.[13]
 {¶ 34} The establishment of a prima facie case of discrimination underMcDonnell Douglas creates a presumption that the employer unlawfully discriminated against the employee.[14] Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that its actions regarding the plaintiff were taken based on legitimate nondiscriminatory reasons.[15] Thereafter, the burden again switches to the plaintiff, who must show that defendant's stated justification is in fact merely a pretext for unlawful discrimination. The ultimate burden of persuasion remains at all times with the plaintiff.[16]
 {¶ 35} In the instant case, the parties do not dispute that Timbers, a female, is a member of a protected class or that she was in fact terminated. There is also no contention that Timbers was not qualified for the position. Therefore, the first three prongs of the test have been satisfied. However, Timbers was replaced by a female. Therefore, in order to establish a prima face case of discrimination, she must show that she was treated differently than similarly situated employees from outside the class. Timbers attempts to fulfill this duty by arguing John Keaty, the manager who succeeded her at the Sharon store received preferential treatment. Timbers claims he engaged in the practice of not paying overtime, yet he was not terminated.
 {¶ 36} A review of the record, however, indicates that when Keaty discovered the payroll department was not paying overtime, he remedied the situation by ordering that overtime wages be paid. Timbers points to Gloria Deal's deposition where she claims she worked off the clock at the Sharon Store's grand opening, when Keaty was the manager. However, a review of her testimony indicates she did not think Keaty knew she was working off the clock:
 {¶ 37} "Q. So after you informed Mr. Ross you were working off the clock, this store manager was not terminated; is that correct?
 {¶ 38} "A. I don't think he knew, you know."[17]
 {¶ 39} Therefore, there is no proof that Keaty engaged in similar conduct. Timbers, therefore, fails to set forth a prima facie case of sex discrimination.
 {¶ 40} Furthermore, Sears set forth a legitimate business reason for terminating Timbers. Based on the evidence presented, Timbers violated the law and Sears' policy by failing to pay overtime wages. Timbers claims this reason is pretextual, however, the evidence does not indicate it is pretextual. Although one employee, Gloria Deal, maintains she was paid for the overtime she worked, multiple employees gave statements to Sears indicating they were not paid overtime and the payroll officers stated Timbers ordered them not to pay overtime and they were berated by Timbers when overtime was paid. There was also evidence that employee Thompson, who initially discovered the unlawful practice, reported it the day before the meeting in which the photographs were discussed.
 {¶ 41} Furthermore, two of the four executives to sign off on Timbers' termination were women. Therefore, the trial court did not err in granting summary judgment on Timbers' sexual discrimination claim.
 {¶ 42} Timbers also alleges the court erred by granting summary judgment on her sexual harassment claim. In order to establish a claim of hostile-environment sexual harassment, Timbers must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.[18]
 {¶ 43} We conclude while the comments cited by Timbers are inappropriate, offensive and immature, they do not rise to the level of sexual harassment because the comments and behavior were not "pervasive." The U.S. Supreme Court in Harris v. Forklift[19] stated that not all workplace conduct that can be construed as having sexual overtones can be characterized as harassment forbidden by the statute.[20] Rather, the conduct complained of must be "severe or pervasive" enough to create an environment that not only the victim subjectively regards as abusive but also a reasonable person would find hostile or abusive.[21] Pursuant to this standard, conduct that is merely offensive is not actionable.[22]
 {¶ 44} In determining whether comments are actionable as harassment the Harris Court concluded:
 {¶ 45} "[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."
 {¶ 46} In the instant case, the comments and behavior do not meet the above test. Robinette was not a frequent visitor to Timbers' store. Robinette referred to Timbers as "Kimmie" three times and "sweetie" four times over an eight month period of time. The manager meetings where the alleged sexual joking occurred, were only conducted once a month.
 {¶ 47} Timbers also does not claim the comments interfered with her ability to perform her job.[23] Therefore, because the alleged comments were not frequent and did not interfere with Timbers' ability to do her job, these comments are not pervasive and, thus, not actionable.
 {¶ 48} Timbers also claims co-employees made racist remarks about Arab-Americans; however, she herself is Caucasian. Thus, Timbers does not have standing to bring a claim of racial harassment because she is not a member of that protected class.
 {¶ 49} Accordingly, while we do not condone the conduct of Sears employees, we conclude as a matter of law that no reasonable jury could find that their actions were severe or pervasive enough to create an objectively hostile work environment.
 {¶ 50} Timbers also claims she was terminated in retaliation for vocally opposing the plans to photograph managers.
 {¶ 51} R.C. 4112.02 provides:
 {¶ 52} "It shall be an unlawful discriminatory practice: * * * (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under section 4112.01 to 4112.07 of the Revised Code."
 {¶ 53} In order to maintain an action for retaliatory discharge, the plaintiff must demonstrate "(1) that she engaged in a protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action."[24] "Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the articulated reason was a pretext."[25]
In order to prove that a stated reason is a pretext for discrimination, the plaintiff must demonstrate both that the reason was false and that the real reason was discrimination.[26]
 {¶ 54} In the instant case, Timbers has failed to prove that she engaged in protective activity by objecting to the photographs. Sears did not have a discriminatory motive for using the photographs. The idea was that the photographs would enable the supervisors to visualize which employee they were discussing. Furthermore, Ruth DeMarco, the operations manager, who did not object to the photographs, was also terminated for the nonpayment of overtime wages. Therefore, because Timbers failed to meet her burden in establishing her termination was retaliatory, the trial court did not err by granting summary judgment on this claim.
 {¶ 55} Timbers also contends that Sears required employees to sign a document stating they would not provide information to Timbers in aid of her lawsuit. Although Jeffrey Curry admitted to signing a document, the content of the document was never established. A hard copy of such document was never submitted showing it existed. Furthermore, although Margaret Radecki, a long time Sears manager, testified in her deposition that she was concerned she was going to lose her job, she clarified it was because of performance problems, not because of information she provided to Timbers. Therefore, since Timbers failed to provide evidence that Sears threatened employees for helping Timbers in her lawsuit, the trial court correctly did not give it credence.
 {¶ 56} Accordingly, Timbers' sole assigned error is overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, J., and Celebrezze, Jr., J., concur.
[1] Timbers also contends that one night she was working after hours and was confronted by the manager of auto repairs who made a sexually inappropriate suggestion to her. She reported the incident to the district manager and Timbers felt he adequately took care of the matter.
[2] Ross Depo. at ¶ 4.
[3] Timbers fails to raise as error the trial court's granting of summary judgment as to her claims of intentional infliction of emotional distress. We therefore find any error related to this claim waived.
[4] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddy v. TheWedding Party, Inc. (1987), 30 Ohio St.3d 35; Northeast Ohio Apt. Assn.v. Cuyahoga Cty. Bd. of Commrs. (1997), 121 Ohio App.3d 188.
[5] Id. at 192, citing Brown v. Sciotio Bd. of Commrs. (1993),87 Ohio App.3d 704.
[6] Temple v. Wean United, Inc. (1997), 50 Ohio St.2d 317, 327.
[7] Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107.
[8] Id. at 293.
[9] See, Genaro v. Cent. Transport, Inc. (1999), 84 Ohio St.3d 293,295, 1999-Ohio-352; Plumbers Steamfitters Commt. v. Ohio Civil RightsComm. (1981), 66 Ohio St.2d 192, 196.
[10] McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 93 S.Ct. 1817,36 L.Ed.2d 668.
[11] Id.
[12] Policastro v. Northwest Airlines, Inc. (C.A. 6, 2002), 297 F.3d 535,538, citing Mitchell v. Toledo Hosp. (C.A. 6, 1992), 964 F.2d 577,582-583.
[13] Mitchell, supra, at 582-583; Kanieski v. Sears, Roebuck Co.,
Cuyahoga App. No. 80833, 2003-Ohio-421.
[14] Texas Dep't of Community Affairs v. Burdine (1981), 450 U.S. 248,254, 67 L.Ed.2d 207, 101 S.Ct. 1089.
[15] Id.
[16] Id.
[17] Deal Depo. at 6.
[18] Hampel v. Food Ingredients Specialties, Inc. (2000),89 Ohio St.3d 169, 176-77.
[19] Id.
[20] Id. See, also, Mentor Savings Bank v. Vinson (1986), 477 U.S. 57,67, 91 L.Ed.2d 49, 106 S.Ct. 2399.
[21] Harris v. Forklift Systems, Inc. (1993), 510 U.S. 17, 21-22,126 L.Ed.2d 295, 114 S.Ct. 367.
[22] Id. at 21.
[23] Baskerville v. Culligan Internat'l Co. (C.A. 7, 1995), 50 F.3d 428,430.
[24] Peterson v. Buckeye Steel Casings (1999), 133 Ohio App.3d 715,722, 727.
[25] Peterson, 133 Ohio App.3d at 727.
[26] St. Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502, 515,125 L.Ed.2d 407, 113 S.Ct. 2742.